# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin Doyle, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Internal Revenue Service, Criminal Investigation (IRS-CI), where I have been so employed since September 2009. I am presently assigned to the Columbus, Ohio, Post of Duty. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I received specific training in the area of criminal investigation. I also received instruction on the legal concept of probable cause, as it relates to search and seizure warrants, and methods and practices of executing such warrants. Over the course of my career I have personally conducted and assisted other law enforcement officers, on numerous investigations involving the following crimes: tax evasion, identity theft, wire fraud, conspiracy, narcotics, and money laundering.

2. The information set forth in this affidavit comes from my personal involvement in this investigation, as well as information provided to me by other law enforcement officers. I have not included every fact known to me concerning this criminal activity but only the facts that I believe are essential to establish the necessary foundation for this affidavit.

3. Your Affiant has investigated and is continuing to investigate the following individuals and business for various offenses related to money laundering:

   A. **ALEJANDRO SAUL VENTURA SANTOS, AKA ALEJANDRO VENTURA, AKA ALEX VENTURA, AKA ALEJANDRO SANTOS, AKA "ALEX" ("ALEJANDRO VENTURA-SANTOS");**

    B. **FRANCISCO C. VENTURA-SANTOS, AKA FRANCISCO C. VENTURA, FRANCISCO VENTURA, AKA FRANCISCO SANTOS ("FRANCISCO VENTURA-SANTOS");**

    C. **LA TIENDITA LLC ("LA TIENDITA"; 2516 West Broad St., Columbus, OH).**

4. Based on the facts set forth herein, my experience, and the experience of other law enforcement officers with whom I have conferred, I submit that there is probable cause to believe that between 2015 and 2021, the exact dates being unknown, **ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS** conspired with others to launder narcotics proceeds from the Southern District of Ohio, to Mexico, through the business **LA TIENDITA**, all in violation of Title 18 U.S.C. §1956(h). Additionally, **ALEJANDRO VENTURA-SANTOS** accepted U.S. currency represented by undercover law enforcement officers to be the proceeds of narcotics trafficking and conducted transactions designed to conceal the source, origin, nature, and control of these proceeds, all in violation of Title 18 U.S.C. §1956(a)(3). Lastly, in 2021 and 2022, **FRANCISCO VENTURA-SANTOS** accepted U.S. currency from an undercover law enforcement officer as payment for the purchase of narcotics, in violation of Title 21 U.S.C. §846 and Title 18 U.S.C. §1956(a)(3).

5. The purpose of this affidavit is to secure an Arrest Warrant for **ALEJANDRO VENTURA-SANTOS**.

6. NOTE: All dates, times, and amounts set forth subsequently in this affidavit should be understood to be approximate.

# CASE BACKROUND

## Money Service Business

7. In 2011, Financial Crimes Enforcement Network (FinCEN) issued a final rule ("2011 MSB Final Rule") defining a money services business (MSB) as, "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States," operating directly, or through an agent, agency, branch, or office, who functions as, among other things, a "money transmitter."

8. FinCEN's regulations define the term "money transmitter" to include a "person that provides money transmission services," or "any other person engaged in the transfer of funds."

9. Corporate MSBs often contract through numerous agents to provide wire transfer services. (NOTE: The term "wire transfer" is used throughout this affidavit. "Wire transfer" should be understood to be a money transfer through an MSB as opposed to a transfer through a traditional bank). As an example, from this investigation, **LA TIENDITA** is a MSB and a wire transmitter, that serves, or has served, as an agent for corporate MSB's including but not limited to: Sigue Money Transfer ("Sigue") and Intermex Wire Transfer, LLC ("Intermex").

## Complicit Money Service Business

10. A money service business (MSB) that cooperates with a drug trafficking organization (DTO) to launder narcotics proceeds is complicit in the illegal activity and wrongdoing. The following is an explanation of how complicit MSB's operate:

    A. Mexican DTO's use cities in the United States as distribution points for narcotics. Once their products have been sold, narcotics traffickers must find a way to return the proceeds from these sales to Mexico. To accomplish this goal, some Mexican DTO's partner with complicit MSB's. Complicit MSB's will accept narcotics proceeds, in the form of bulk

U.S. currency, from couriers that work for Mexican DTO's. In addition to bulk U.S. currency, the courier, or another member of the DTO, will provide complicit MSB's with a list of payee names in Mexico. The complicit MSB will structure the bulk U.S. currency into smaller amounts, often between $500-$999, and then send wire transfers to Mexico using the list of payee names as recipients. The complicit MSB falsifies the information for the sender of the wire transfer, to include name, address, and phone number. Once the wire transfers have been sent the complicit MSB will text photos of the receipts from the transactions to the DTO. The receipts prove to the DTO that the transfers have been conducted and provide the information necessary for these wire transfers to be redeemed in Mexico. For their participation in the money laundering conspiracy complicit MSB's collect a fee, often 10%, of the total bulk currency provided to them. (NOTE: The above description of a complicit MSB should be understood to be generic and not an exact description of the activities occurring at **LA TIENDITA**.)

## <u>VENTURA-SANTOS Money Laundering Organization (MLO)</u>

11. In approximately 2019, investigators with the High Intensity Drug Trafficking Area Task Force ("HIDTA"), Columbus Police Department, Ohio Organized Crime Investigations Commission, and IRS-CI, began investigating a grocery store named **LA TIENDITA** located at 2516 W. Broad St., in Columbus, OH.

12. This investigation eventually merged with an investigation being conducted by Homeland Security Investigations (HSI) in Columbus, OH, and the Delaware County Drug Task Force (DCDTF).

13. Investigators determined that **LA TIENDITA** was serving as an agent for more than one money transfer service. Records obtained from these money transfer services detailed millions of dollars in wire transfers from **LA TIENDITA** to Mexico.

14. Evidence established during this investigation and subsequently detailed in this affidavit establishes probable cause that **ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS**, at a minimum, utilized **LA TIENDITA** as a disguise for a sophisticated money laundering operation. This disguise allowed **ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS** to serve as Third-Party Money Launderers ("3PML") for various Mexican Drug Trafficking Organizations (DTOs). This affidavit will also establish probable cause that **ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS** conspired with others to conduct wire transfers, with what they believed were the proceeds of a Specified Unlawful Act ("SUA"), namely narcotics trafficking, from the Southern District of Ohio, to Mexico. **Records obtained from various wire transfer services show that the wire transfers initiated from LA TIENDITA to Mexico exceed $5,000,000 from approximately 2015 to 2021.**

15. The evidence provided subsequently in this affidavit will include:

    A.  Witnesses: Admitted narcotics traffickers provided statements regarding their interaction with **ALEJANDRO VENTURA-SANTOS** and **LA TIENDITA**.

    B.  Anti-Money Laundering Training: **LA TIENDITA** served as an agent for wire transfer services. As employees of **LA TIENDITA ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS** received training on subjects including money laundering and structuring.

    C.  Video Surveillance: During the course of this investigation video surveillance was used to determine if actual customers were entering and exiting **LA TIENDITA** in a manner that harmonized with wire transfer records. Investigators determined that in more than one instance customer arrivals and departures were less than the number of wire transfers sent from **LA TIENDITA** during the same time period.

    D.  Evidence that, during the time period relevant to this affidavit, more than one wire transfer service discontinued their business relationship with **LA TIENDITA** based on questionable wire transfer activity.

    E.  Evidence that **ALEJANDRO VENTURA-SANTOS** accepted U.S. currency from undercover law enforcement officers that represented the funds to be the proceeds of narcotics trafficking. After these monies were accepted by **ALEJANDRO VENTURA-SANTOS**, wire transfers were conducted from **LA TIENDITA** to the recipient names provided by the undercover law enforcement officers.

    F.  Evidence that on multiple occasions **FRANCISCO VENTURA-SANTOS** accepted U.S. currency from an undercover law enforcement officer as payment for narcotics.

G.  The discovery of a phone number known to be used by **ALEJANDRO VENTURA-SANTOS** during a search warrant related to narcotics.

H.  Tax records from the Internal Revenue Service reflecting income and expenses of **LA TIENDITA** and members of the **VENTURA-SANTOS MLO**.

I.  Statistical Analysis: Wire transfer data was analyzed for **LA TIENDITA**. This examination revealed where wire transfers sent by **LA TIENDITA** were paid and the average amount of these transfers.

# PROBABLE CAUSE

## Witnesses

### Witness #1

16. Witness #1 is an admitted narcotics trafficker that distributed Heroin in the Southern District of Ohio during the timeframe covered by this affidavit.

17. Witness #1 was shown a six-person photo lineup generated through a law enforcement database and identified **ALEJANDRO VENTURA-SANTOS** as the individual he/she knows as **"ALEX"**.

18. Witness #1 would provide **"ALEX"** with the money from the boss. **"ALEX"** was responsible for talking to the boss and figuring out which stores and which people would be receiving this money. Witness #1 was told by his/her boss how much money to take to **"ALEX"**. **"ALEX"** already had the names of the receivers when Witness #1 dropped the money off.

19. **"ALEX"** would send a message to Witness #1's boss saying that he was ready and the boss should send Witness #1. Sometimes **"ALEX"** was busy when Witness #1 arrived and he/she had to waste time in the back where they sell the meats until **"ALEX"** could meet with him/her. Witness #1 would let his/her boss know that he/she gave **"ALEX"** the money and then **"ALEX"** would handle all the details with the boss.

20. Witness #1 went to see **"ALEX"** between 20 and 30 times. Witness #1 maintained a notebook that contained a ledger of expenses for his/her narcotics trafficking. The name **"ALEX"** will appear in the notebook and it will always have a dollar amount. $6,000 was the lowest amount of money that Witness #1 ever took to **"ALEX"**. The most money that Witness #1 ever took to **"ALEX"** was $12,000-$15,000.

21. NOTE: Law enforcement conducted a search warrant in conjunction with the arrest of Witness #1. During this search warrant law enforcement discovered handwritten notes that contained numbers beside the name **"ALEX"**.

## Witness #2

22. Witness #2 is an admitted narcotics trafficker that distributed Heroin in the Southern District of Ohio during the timeframe covered by this affidavit.

23. Witness #2 was shown a six-person photo lineup generated through a law enforcement database and identified **ALEJANDRO VENTURA-SANTOS** as the individual he/she knows as **"ALEX"**.

24. Witness #2 was directed by text message to go to a store on Broad St. and told to ask for **"ALEX"**. Witness #2 did not know **"ALEX"** prior to this. The store was a small Mexican store right next to a Boost Mobile store (NOTE: This description is consistent with **LA TIENDITA**).

25. Witness #2 estimates he/she took money to **"ALEX"** approximately 25 to 50 times. Most of the time this money was provided to **"ALEX"**. Witness #2 also provided money to an additional male and a female that were approximately the same age as **"ALEX"**.

26. Witness #2 estimates they delivered approximately $200,000 in total to **"ALEX"** (NOTE: Your Affiant understood $200,000 to be the total amount Witness #2 provided to **"ALEX"** and the other two individuals).

27. The money that Witness #2 delivered to **"ALEX"** was in sandwich bags that each contained $1,000.

28. NOTE: On one occasion law enforcement officers observed Witness #2 enter **LA TIENDITA** and then exit the store in less than one minute.

## Witness #3

29. Witness #3 is an admitted narcotics trafficker that distributed Heroin and Crystal Methamphetamine in the Southern District of Ohio during the timeframe covered by this affidavit.

30. Witness #3 was shown a photo of **ALEJANDRO VENTURA-SANTOS**. Witness #3 stated the individual looks really familiar and he/she believes this is **"ALEX"**.

31. Witness #3 was directed by his/her Mexican source of supply for narcotics to deliver money to **"ALEX"** at **LA TIENDITA**.

32. Witness #3 made three to four deliveries to **LA TIENDITA** and provided **"ALEX"** with a total of approximately $60,000. This money was from the sale of Methamphetamine and Heroin. Sometimes the money was in stacks and sometimes it was in envelopes. There was never any communication between Witness #3 and **"ALEX"**. When **"ALEX"** was not present at **LA TIENDITA**, the money was left with an older male, with instruction to give it to **"ALEX"**.

## Anti-Money Laundering (AML) Training

33. An AML program is a set of regulations and procedures that financial institutions follow to prevent and detect money laundering or terrorist financing activities. Wire transfer services generally require their agents to complete AML Training when they initially become agents and then subsequently while they serve as agents. Personnel from RIA Financial ("RIA"), Intercambio Express ("Intercambio"), Intermex Wire Transfer Service, LLC ("Intermex"), and Sigue Money Transfer ("Sigue"), provided information about their AML Training. This training would have included the following topics: Suspicious activity, Currency Transaction Reports (CTR's), structuring, money laundering red flags, money laundering phases, and Bank Secrecy Act (BSA) requirements. For varying periods of time since 2015, **LA TIENDITA** has served as an agent for the above wire transfer services as well as others.

34. Wire transfer services usually require that their agents designate a Compliance Officer. **ALEJANDRO VENTURA-SANTOS** was the Compliance Officer at **LA TIENDITA** for the wire transfer services RIA, Intermex, and Sigue.

35. RIA doesn't activate agents until initial compliance training is completed. This training was completed July 17, 2018, by **ALEJANDRO VENTURA-SANTOS**. This training was online and included a quiz. According to RIA personnel, **ALEJANDRO VENTURA-SANTOS** provided a training log that reflected he had provided training to **FRANCISCO SANTOS** and others in August of 2018. The log was signed by these individuals. The training was AML, but no specifics were provided. Additionally, RIA provides agents with a quarterly newsletter that covers AML topics.

36. Personnel from Intercambio were unsure of the title of **ALEX VENTURA** but **FRANCISCO VENTURA SANTOS** has the title of "Cashier". Both individuals attended training in person on

June 11, 2019, at the Crown Plaza in Columbus, OH. The topics covered included: BSA regulations, structuring, money laundering, and agent stores that had gotten in trouble.

37. Intermex requires agents to complete training yearly and take a quiz. **ALEJANDRO VENTURA-SANTOS** took the quiz three times and always passed. **FRANCISCO VENTURA-SANTOS** took the quiz one time and passed on September 2, 2021.

38. Sigue provides its agents with a newsletter every month that must be read and initialed by everyone that processes transactions. A Sigue representative used the January 2019 newsletter as an example and the topic for this month was "Money Laundering Red Flags". The only training that **FRANCISCO VENTURA** would have received was from **ALEJANDRO SANTOS**.

39. **Further, the previously named wire transfer services all advised that the customer must be present at the agent location for transactions to be conducted (see below "Video Surveillance").**

40. In summary, on multiple occasions, from multiple sources, both **ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS** received training specifically designed to detect and prevent money laundering through an MSB.

## <u>Video Surveillance</u>

41. Your Affiant is aware that complicit MSB's often receive bulk amounts of U.S. currency from a single individual. These bulk amounts of U.S. currency are then structured into smaller amounts and used to conduct wire transfers to other geographic areas. For example, a single delivery of $10,000 in narcotics proceeds to a complicit MSB in the United States may result in 10 to 13 wire transfers to Mexico. These wire transfers may occur over a period of hours or days. When complicit MSB's engage in this type of activity there will often be wire transfers initiated in time frames where few or no customers have entered the business.

42. Law enforcement established video surveillance on the front door of **LA TIENDITA**. This video surveillance provided law enforcement the opportunity to compare the arrival and exit of individuals to the physical store location, with the wire transfers being sent from this store. Below are examples of what investigators observed (all times approximate):

   A. January 12, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 9:27:00 and 9:41:00 PM (All times Eastern Standard). During this same time frame **LA TIENDITA** utilized more than one wire transfer service to initiate three wire transfers to Mexico.

   B. January 13, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 3:32:00 and 3:47:00 PM. During this same time frame **LA TIENDITA** utilized more than one wire transfer service to initiate three wire transfers to Mexico.

   C. February 3, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 6:35:00 and 6:42:00 PM. During this same time frame **LA TIENDITA** utilized more than one wire transfer service

to initiate three wire transfers to Mexico.

D.  March 8, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 2:44:00 and 2:58:00 PM. During this same time frame **LA TIENDITA** utilized more than one wire transfer service to initiate three wire transfers to Mexico.

E.  March 23, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 8:43:00 and 8:54:00 PM. During this same time frame **LA TIENDITA** utilized more than one wire transfer service to initiate three wire transfers to Mexico.

F.  April 8, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 3:10:00 and 3:18:00 PM. During this same time frame **LA TIENDITA** utilized more than one wire transfer service to initiate three wire transfers to Mexico.

G.  April 10, 2020, approximately no individuals entered or exited the front door of **LA TIENDITA**, 2516 West Broad St., Columbus, OH, between 7:59:00 and 8:14:00 PM. During this same time frame **LA TIENDITA** utilized more than one wire transfer service to initiate three wire transfers to Mexico.

43. NOTE: The wire transfers that occurred during the above periods of video surveillance were all greater than $500.00 and less than $900.00. Further, most of these wire transfers list Nayarit as the location of the paying agent or payee. Your Affiant is aware that Nayarit is a small state in western Mexico that has historically been a significant source of Heroin to the United States and specifically Columbus, OH.

# Discontinued Relationships

## Transfast

44. **LA TIENDITA** formerly served as an agent for a corporate MSB named Transfast.

45. On August 21, 2015, Transfast identified transactions made by **LA TIENDITA** that could have been structuring or money laundering. These transactions were all between $700 and $1,700. All of these transactions were made to the Mexican states: Nayarit, Jalisco, Michoacán, Monterrey, and Sinaloa.

46. All of the transactions identified by Transfast occurred in June, July, and August of 2015. Below are the transactions by month and the total dollar amounts of these transactions:

    A. June 2015: 220 transactions; $201,209

    B. July 2015: 368 transactions; $340,454

    C. August 2015: 398 transactions; $331,483

47. Based on the pattern of the transactions and the fact that they went to high-risk zones for Mexican drug cartels, the Compliance Officer asked that **LA TIENDITA** be suspended as an Agent. Also, 45 transactions that were pending were cancelled.

48. Transfast sent a letter to the registered owner of **LA TIENDITA** explaining their concerns. The Transfast Compliance Officer spoke to an individual named **"ALEJANDRO"** by phone. **"ALEJANDRO"** is not the Registered Owner but was someone with authority at **LA TIENDITA**. Transfast instructed **"ALEJANDRO"** to justify the pattern of transactions with documents or the criteria used to authorize this number of transactions. According to Trasfast this pattern of transactions suggests "willful blindness".

49. The Registered Compliance Officer for **LA TIENDITA** was **ALEJANDRO SANTOS**. Transfast is not certain that this was the **"ALEJANDRO"** they spoke too.

50. Transfast never received substantiation from **LA TIENDITA** and **LA TIENDITA** was closed as an agent.

## Viamericas

51. **LA TIENDITA** formerly served as an agent for a corporate MSB named Viamericas Corporation ("Viamericas").

52. In approximately 2015, Viamericas terminated their relationship with **LA TIENDITA**.

53. Viamericas provided a letter dated June 22, 2015, that advised **LA TIENDITA** of a termination of service. The letter read in part:

   A. *You are hereby notified that Viamericas Corporation ("the Company") has ceased to provide money transfer services to La Tiendita due to a failure to abide by the Company's Legal Compliance program.*

   B. *Paragraph 10 of the Viamericas Application and Trust Agreement you executed on September 4, 2013, states that you must, "comply with any and all procedures established by Company . . . and cooperate in satisfying any applicable licensing, reporting, and/or banking requirements." Furthermore, Paragraph 20 of the Trust Agreement provides that you are responsible for complying with all of the Company's procedures, including complying with federal and state anti-money laundering laws and regulations, reporting and refusing to complete suspicious transactions, training employees on anti-money laundering issues, and complying with regulations enacted by OFAC.*

   C. *A recent audit of La Tiendita has revealed serious violations of Viamericas' Legal Compliance Program. Due to these violations, Viamericas will no longer provide money*

*transfer service to your location. Please remit to Viamericas any and all Trust Funds and*

*return any PC, Red Telephone, or other property provided by the Company.*

    D.  NOTE: Viamericas advised that the 2013 date in the above letter is an error and **LA TIENDITA** was not an agent until 2015.

54. Viamericas knows what is typical amongst its Mexican customers: an approximate average of $400 per transaction, shared sur names between sender and receiver, and transactions to a wide variety of destinations. The transactions that **LA TIENDITA** conducted through Viamericas were suspicious for a number of reasons including but not limited to the following:

    A.  Many transactions paid out in Sinaloa and Nayarit. These states are two of the highest risk states from a narcotics perspective.

    B.  A higher-than-expected transactional value to Sinaloa and Nayarit.

    C.  Many transactions where a familial relationship between the sender and receiver could not be identified.

    D.  Groups of suspicious transactions that appeared to be carried out at the same time.

55. The Compliance Officer at Viamericas is uncomfortable with the vast majority of transactions conducted by **LA TIENDITA**. If **LA TIENDITA** applied to be reopened with Viamericas the application would be denied. The transactions conducted by **LA TIENDITA** are no good, they appear to be related to narcotics, and they're indicative of an agent being complicit or willfully blind.

# ALEJANDRO VENTURA-SANTOS

56. On multiple occasions in 2021, undercover law enforcement officers ("UC #1" and "UC #2") interacted with **ALEJANDRO VENTURA-SANTOS** at **LA TIENDITA**, 2516 W. Broad St., Columbus, OH. One of these meetings occurred on May 18, 2021, and is detailed below:

    D. At approximately 3:33 PM, "UC #1" and "UC #2" arrived at **LA TIENDITA**. Upon arriving at the **LA TIENDITA** parking lot, "UC #1" called **ALEJANDRO VENTURA-SANTOS** to tell him they were outside in the parking lot. **ALEJANDRO VENTURA-SANTOS** told "UC #1" that he would be right out. Soon thereafter, **ALEJANDRO VENTURA-SANTOS** met with "UC #1" and "UC #2" in their vehicle.

    E. During the conversation in the vehicle, **ALEJANDRO VENTURA-SANTOS** agreed to wire cash from the sale of Heroin through a money transmitting service. **ALEJANDRO VENTURA-SANTOS** told "UC #1" and "UC #2" that he could wire up to $900 per person. "UC #1" and "UC #2" told **ALEJANDRO VENTURA-SANTOS** that they could probably gather anywhere between 8 to 10 names to send the wires to. "UC #1" and "UC #2" offered to pay **ALEJANDRO VENTURA-SANTOS** a 10% fee for his services and **ALEJANDRO VENTURA-SANTOS** agreed. "UC #1" told **ALEJANDRO VENTURA-SANTOS** that they would be back in about an hour with the money and the names.

    F. At approximately 4:56 PM, "UC #2" arrived at **LA TIENDITA** with a McDonalds paper bag containing $9,900 in U.S. currency and a note for **ALEJANDRO VENTURA-SANTOS**. The note listed 10 names as well as a city and state for each name. The cities listed on the note included the following: El Paso, TX; San Antonio, TX; San Diego, CA; West Covina, CA; and Tucson, AZ. The note indicated that $900 should be sent to each

person and that **ALEJANDRO VENTURA-SANTOS** should keep the 10% fee of $900 for himself. "UC #2" entered **LA TIENDITA** and handed **ALEJANDRO VENTURA-SANTOS** the McDonalds paper bag containing $9,900 in cash, the note mentioned above, and two cookies. "UC #2" walked out of **LA TIENDITA** immediately thereafter.

57. Between May 19, 2021, and May 21, 2021, the 10 names provided by "UC #2" to **ALEJANDRO VENTURA-SANTOS**, were listed as the recipients of wire transfers conducted from **LA TIENDITA** through RIA Financial Services. The wire transfers are detailed below:

| Transaction No. | Date | Amount | Fee | Sending Agent | Sending Agent Address | Beneficiary Name |
|---|---|---|---|---|---|---|
| US543138360 | 05/19/2021 | 891.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US547431560 | 05/19/2021 | 890.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US551227260 | 05/19/2021 | 890.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US562108760 | 05/20/2021 | 891.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US568614560 | 05/20/2021 | 890.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US573358360 | 05/20/2021 | 891.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US589039260 | 05/21/2021 | 890.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US598722960 | 05/21/2021 | 891.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US623166560 | 05/22/2021 | 890.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |
| US627764060 | 05/22/2021 | 890.00 | 9.00 | La Tiendita LLC | 2516 W Broad St | REDACTED |

58. Receipts for the above listed transactions were sent to "UC #1" by **ALEJANDRO VENTURA-SANTOS** via WhatsApp. **ALEJANDRO VENTURA-SANTOS** previously communicated with "UC #1" utilizing the phone number 614.330.9464. The above receipts were sent to "UC #1" by **ALEJANDRO VENTURA-SANTOS** utilizing the phone number 614.363.8067. Your Affiant is aware that it is a common practice amongst criminals, specifically those individuals involved in narcotics trafficking, to utilize multiple phones for the purposes of concealing and facilitating their unlawful activities.

# FRANCISCO VENTURA-SANTOS

59. On multiple occasions in 2021 and 2022, an undercover law enforcement officer met with

**FRANCISCO VENTURA-SANTOS** in the parking lot of **LA TIENDITA**, 2516 W. Broad St.,

Columbus, OH. During these meetings the undercover law enforcement officer ("UC #3")

delivered U.S. currency to **FRANCISCO VENTURA-SANTOS** as payment for narcotics.

These meetings are detailed below:

    A. On May 28, 2021, a package of Methamphetamine was received by "UC #3" as part of a

       controlled buy from a source of supply ("SOS") in Mexico.  After "UC #3" received the

       Methamphetamine, "UC #3" and the "SOS" made arrangements for "UC #3" to provide

       $3,000 to someone in Columbus as payment.  The "SOS" sent "UC #3" a Whatsapp

       contact for **FRANCISCO VENTURA-SANTOS**.  "UC #3" and **FRANCISCO**

       **VENTURA-SANTOS** utilized Whatsapp to coordinate the delivery of the money.

       **FRANCISCO VENTURA-SANTOS** instructed "UC #3" to meet him in the parking lot

       of **LA TIENDITA**.  **FRANCISCO VENTURA-SANTOS** told "UC #3" he would be in

       a blue van. "UC #3" arrived in the parking lot of **LA TIENDITA** and observed

       **FRANCISCO VENTURA-SANTOS** in the driver's seat of a blue Mazda van. "UC #3"

       gave **FRANCISCO VENTURA-SANTOS** $3,000 in U.S. currency as payment to the

       "SOS" for the Methamphetamine.  During Whatsapp communication with "UC #3"

       **FRANCISCO VENTURA-SANTOS** described the "SOS" as "the one with the food".

       The "SOS" refers to narcotics as food routinely during conversations with "UC #3".

    B. On June 21, 2021, "UC #3" and the "SOS" finalized arrangements for a money delivery

       to pay down the debt owed to the "SOS" for Methamphetamine. The "SOS" and "UC #3"

       agreed on a meeting time and the "SOS" instructed "UC #3" to reach out to

FRANCISCO VENTURA-SANTOS to arrange the details. "UC #3" contacted FRANCISCO VENTURA-SANTOS via WhatsApp and arranged a 3:30 PM meeting time in the parking lot of LA TIENDITA. Vehicle descriptions were also arranged between "UC #3" and FRANCISCO VENTURA-SANTOS prior to the meeting. Surveillance observed FRANCISCO VENTURA-SANTOS enter the LA TIENDITA parking lot in a white Jeep Commander, which was registered to another individual. FRANCISCO VENTURA-SANTOS parked next to LA TIENDITA and waited in the vehicle with the driver's door open. "UC #3" entered the parking lot shortly after FRANCISCO VENTURA-SANTOS arrived and gave FRANCISCO VENTURA-SANTOS $3,000 in U.S. currency. After "UC #3" left the area surveillance observed FRANCISCO VENTURA-SANTOS enter a gate at the rear of the building and walk towards the open back door of LA TIENDITA. Surveillance was ended shortly after. "UC #3" then confirmed the money was given to FRANCISCO VENTURA-SANTOS via text message to the "SOS".

C. On July 7, 2021, "UC #3" and the "SOS" finalized arrangements for another money delivery to pay down the debt owed to the "SOS" for Methamphetamine. The "SOS" and "UC #3" agreed on a meeting time and the "SOS" instructed "UC #3" to reach out to FRANCISCO VENTURA-SANTOS to arrange the details. "UC #3" contacted FRANCISCO VENTURA-SANTOS via WhatsApp and arranged a 3:30 PM meeting time in the parking lot of LA TIENDITA. Vehicle descriptions were also arranged between "UC #3" and FRANCISCO VENTURA-SANTOS prior to the meeting. Surveillance observed FRANCISCO VENTURA-SANTOS enter the lot in a white Jeep Commander, which was registered to another individual. FRANCISCO VENTURA-

SANTOS parked next to **LA TIENDITA** and waited in the driver's seat of the vehicle. "UC #3" entered the parking lot shortly after **FRANCISCO VENTURA-SANTOS** arrived and gave **FRANCISCO VENTURA-SANTOS** $4,100 in U.S. currency. After "UC #3" left the area, surveillance observed **FRANCISCO VENTURA-SANTOS** enter a gate at the rear of the building and walk towards the open back door to **LA TIENDITA**. "UC #3" then sent a message to the "SOS" confirming the money was dropped off to **FRANCISCO VENTURA-SANTOS**. Detectives maintained surveillance on **LA TIENDITA** and observed **FRANCISCO VENTURA-SANTOS** exit the store a short time later carrying a rolled up, small white bag. Detectives followed him to the Key Bank located at 3505 Sullivant Ave., Columbus, OH, which he entered carrying the same white bag. He exited the bank a short time later carrying a piece of paper. **FRANCISCO VENTURA-SANTOS** left the bank parking lot and traveled to a gas station before returning to **LA TIENDITA** and entering the store.

D. On July 13, 2021, "UC #3" and the "SOS" arranged a money delivery for the purchase of two (2) ounces of Cocaine. The agreed to price for the cocaine was $3,250. "UC #3" and the "SOS" agreed on a meeting time and the "SOS" instructed "UC #3" to reach out to **FRANCISCO VENTURA-SANTOS** to deliver the money. The "SOS" told "UC #3" to pick up the Cocaine from a female after the money was given to **FRANCISCO VENTURA-SANTOS**. "UC #3" contacted **FRANCISCO VENTURA-SANTOS** via WhatsApp and arranged a 4:30 PM meeting time in the parking lot of **LA TIENDITA**. Surveillance observed **FRANCISCO VENTURA-SANTOS** enter the lot in a white Jeep Commander, which was registered to another individual. **FRANCISCO VENTURA-SANTOS** parked next to **LA TIENDITA** and waited in the driver's seat of the vehicle.

"UC #3" entered the parking lot shortly after **FRANCISCO VENTURA-SANTOS** arrived and gave **FRANCISCO VENTURA-SANTOS** $3,250 in U.S. currency. After "UC #3" left the area surveillance observed **FRANCISCO VENTURA-SANTOS** enter a gate at the rear of the building and walk towards the open back door to **LA TIENDITA**. "UC #3" then sent a message to the "SOS" confirming the money was delivered to **FRANCISCO VENTURA-SANTOS**. The "SOS" then told "UC #3" the female was ready to meet. "UC #3" subsequently met with the female and she provided "UC #3" with Cocaine.

E. On August 26, 2021, "UC #3" and the "SOS" arranged another money delivery to pay down the debt owed to the "SOS" for Methamphetamine. The "SOS" and "UC #3" agreed on a meeting time and the "SOS" instructed "UC #3" to reach out to **FRANCISCO VENTURA-SANTOS** to arrange the details. "UC #3" contacted **FRANCISCO VENTURA-SANTOS** via WhatsApp and arranged a 3:30 PM meeting time in the parking lot of **LA TIENDITA**. Vehicle descriptions were also arranged between "UC #3" and **FRANCISCO VENTURA-SANTOS** prior to the meeting. Surveillance observed a white Jeep Commander used by **FRANCISCO VENTURA-SANTOS** parked in the parking lot. "UC #3" arrived on the parking lot of **LA TIENDITA** and gave **FRANCISCO VENTURA-SANTOS** a brown bag containing $6,500 in U.S. currency. "UC #3" told **FRANCISCO VENTURA-SANTOS** the dollar amount in the bag prior to leaving the parking lot. Surveillance was maintained on **FRANCISCO VENTURA-SANTOS** and he eventually went into the front door of **LA TIENDITA**.

F. On October 29, 2021, "UC #3" and the "SOS" arranged another money delivery to pay down on the debt owed to the "SOS" for Methamphetamine. The "SOS" and "UC #3" agreed on a meeting time and location. Vehicle descriptions were also arranged between "UC #3" and **FRANCISCO VENTURA-SANTOS** prior to the meeting. Surveillance observed a white Jeep Commander used by **FRANCISCO VENTURA-SANTOS** parked in the parking lot. "UC #3" arrived on the parking lot of **LA TIENDITA** and gave **FRANCISCO VENTURA-SANTOS** $3,500 in U.S. currency. "UC #3" told **FRANCISCO VENTURA-SANTOS** the dollar amount in the bag prior to leaving the parking lot. Surveillance was maintained on **FRANCISCO VENTURA-SANTOS** and he eventually went into the front door of **LA TIENDITA**.

G. On December 7, 2021, "UC #3" and the "SOS" arranged another money drop to pay down on the debt owed to the "SOS" for Methamphetamine and as a down payment on another Methamphetamine purchase. The "SOS" and "UC #3" agreed on a meeting time and location. Vehicle descriptions were also arranged between "UC #3" and **FRANCISCO VENTURA-SANTOS** prior to the meeting. Surveillance observed **FRANCISCO VENTURA-SANTOS** arrive at **LA TIENDITA** in a blue Mazda van. He exited the Mazda and entered the store through the front door. "UC #3" arrived on the parking lot of **LA TIENDITA** and **FRANCISCO VENTURA-SANTOS** exited the front door and met "UC #3" in the parking lot. "UC #3" gave $10,000 in U.S. currency to **FRANCISCO VENTURA-SANTOS** and told him the dollar amount prior to leaving the parking lot. Surveillance was maintained on **FRANCISCO VENTURA-SANTOS** and he went back into the front door of the **LA TIENDITA** store after meeting with "UC #3". A short time later **FRANCISCO VENTURA-SANTOS** exited **LA TIENDITA**

carrying a black bag, which appeared to sag from the weight inside, and left the lot in his blue Mazda van. He traveled to the Key Bank located at 3505 Sullivant Ave., Columbus, OH. **FRANCISCO VENTURA-SANTOS** went inside the Key Bank and came back out a short time later carrying a white paper. He then traveled back to **LA TIENDITA**. Surveillance was ended a short time later.

H. On February 15, 2022, "UC #3" and the "SOS" arranged another money drop to pay down on the debt owed to the "SOS" for Methamphetamine and as a down payment on another Methamphetamine purchase. The "SOS" and "UC #3" agreed on a meeting time and location. Vehicle descriptions were also arranged between "UC #3" and **FRANCISCO VENTURA-SANTOS** prior to the meeting. Surveillance observed **FRANCISCO VENTURA-SANTOS** arrive at **LA TIENDITA** in a blue Mazda van. "UC #3" arrived on the parking lot of **LA TIENDITA** and parked near the blue Mazda. "UC #3" gave $2,000 to **FRANCISCO VENTURA-SANTOS** and told him the dollar amount prior to leaving the parking lot. Surveillance was maintained on **FRANCISCO VENTURA-SANTOS** and he went back into the front door of **LA TIENDITA** after meeting with "UC #3". Surveillance was ended a short time later.

I. On March 2, 2022, "UC #3" and the "SOS" arranged another money drop to pay down on the debt owed to the "SOS" for Heroin. The "SOS" and "UC #3" agreed on a meeting time and location. Vehicle descriptions were also arranged between "UC #3" and **FRANCISCO VENTURA-SANTOS** prior to the meeting. "UC #3" contacted **FRANCISCO VENTURA-SANTOS** and stated they had arrived at the **LA TIENDITA** parking lot. Usually **FRANCISCO VENTURA-SANTOS** was in his vehicle waiting for "UC #3". Surveillance observed **FRANCISCO VENTURA-SANTOS** exit **LA**

TIENDITA and walk towards the parking lot where "UC #3" was. "UC #3" met with **FRANCISCO VENTURA-SANTOS** in the parking lot and gave him the $3,000, which was inside an empty bag of chips. "UC #3" also told him the dollar amount prior to leaving the parking lot. Surveillance was maintained on **FRANCISCO VENTURA-SANTOS** and he went back into the front door of the **LA TIENDITA** store after meeting with "UC #3". Surveillance was ended a short time later.

J. On April 7, 2022, "UC #3" and the "SOS" arranged for the final money drop to pay for the Methamphetamine. The "SOS" and "UC #3" agreed on a meeting time and location. The UC detective contacted **FRANCISCO VENTURA-SANTOS** and stated they had arrived at the **LA TIENDITA** parking lot. **FRANCISCO VENTURA-SANTOS** was in his vehicle waiting for "UC #3". "UC #3" met with **FRANCISCO VENTURA-SANTOS** in the parking lot and gave him the $4,000, which was inside a red shopping bag. "UC #3" also told him the dollar amount prior to leaving the parking lot. Surveillance was maintained on **FRANCISCO VENTURA-SANTOS** and he went back into the front door of **LA TIENDITA** after meeting with "UC #3". Surveillance was ended a short time later.

K. On April 25, 2022, "UC #3" continued arrangements for a five (5) pound Methamphetamine deal. As a result, "UC #3" was instructed by the "SOS" to make payment to **FRANCISO VENTURA-SANTOS**. "UC #3" and the "SOS" arranged for $8,000 to be delivered as a down payment for the Methamphetamine. "UC #3" agreed to drop the $8,000 to **FRANCISO VENTURA-SANTOS**. The "SOS" and "UC #3" agreed on a meeting time and location. "UC #3" contacted **FRANCISO VENTURA-SANTOS** and asked if he was ready to meet. **FRANCISO VENTURA-SANTOS** was in his blue

Mazda van waiting for "UC #3". "UC #3" met with **FRANCISO VENTURA-SANTOS** in the parking lot and gave him the $8,000, which was inside a takeout food container. "UC #3" also told him the dollar amount prior to leaving the parking lot. Surveillance was maintained on **FRANCISO VENTURA-SANTOS** and he went back into the front door of the **LA TIENDITA** store after meeting with "UC #3". Surveillance was ended a short time later.

60. As detailed above, after meeting with "UC #3" on July 7, 2021, **FRANCISCO VENTURA-SANTOS** traveled to a Key Bank located at 3505 Sullivant Ave., Columbus, OH. Records provided by Key Bank reflect that on July 7, 2021, a $21,000.00 deposit was made to an account ending in x7568, and held in the name, "Intermex Wire Transfer, LLC, La Tiendita LLC #610242". According to personnel from Intermex, the Key Bank account ending in x7568, is one of the accounts **LA TIENDITA** can use to make payments to Intermex. The deposit slip for the $21,000.00 deposit indicates a date and time of "07/07/2021 16:18", and a branch name of "452-Sullivant". Additionally, a Currency Transaction Report (CTR) filed by Key Bank indicates that **FRANCISCO C. VENTURA** made a deposit of $21,000 on July 7, 2021, to the Key Bank account ending in x7568.

## <u>"Alex tienda"</u>

61. On October 13, 2021, law enforcement executed search warrants at multiple locations in Columbus, OH, as a result of a drug trafficking investigation. One of the locations searched was 1279 Woodbrook Lane Apt. B, Columbus, OH. Two individuals were inside the residence during the execution of the warrant. Detectives searched the residence and located drug ledgers, a small baggie of Heroin, cell phones, and $1,781. Detectives also located several lists of names and phone numbers hidden in a cigar pouch. One of the names was **"Alex tienda"** with a phone number of 614-330-9464 listed next to it.

62. NOTE: 614.330.9464 is a phone number that **ALEJANDRO VENTURA-SANTOS** utilized to communicate with "UC #1".

63. Detectives also located wire transfer receipts from **LA TIENDITA** (2 receipts) as well as another store (1 receipt) in Columbus, OH. None of the senders listed on the receipts were the individuals inside the residence at the time of the search warrant. Additionally, none of the listed addresses for the senders appeared to be legitimate addresses. The receipts all listed payee addresses in Baja California Norte, Mexico.

64. NOTE: These three wire transfer receipts all reflect amounts between $500-$999 and appear to have been transacted on the same day.

## **Income Taxes**

65. Your Affiant has previously investigated several "front" businesses. "Front" businesses provide a veneer of legitimacy to criminal organizations and serve to camouflage the true nature of their illicit operations. Your Affiant is aware that one indication that a business may be a "front" is the lack of income reported for the business and the individuals associated with it. Investigators assigned to this investigation obtained income tax records from the Internal Revenue Service (IRS) to better understand the income and expenses of the **VENTURA-SANTOS Money Laundering Organization**.

## **LA TIENDITA**

66. Income and expenses from **LA TIENDITA** are claimed on a Profit or Loss From Business (Sole Proprietorship) Schedule C (Schedule C) as part of the U.S. Individual Income Tax Return Form 1040 (Form 1040) filed for an individual known to law enforcement (NOTE: This is neither **ALEJANDRO VENTURA-SANTOS** nor **FRANCISCO VENTURA-SANTOS**). According to records obtained from the IRS, the below table reflects the net profit or (loss) from **LA TIENDITA**:

| Year | Name | Net Profit |
|------|------|------------|
| 2015 | LA TIENDITA LLC | $ (3,064.00) |
| 2016 | "LA T" | $ 6,874.00 |
| 2017 | LA TIENDITA LLC | $ 10,974.00 |
| 2018 | LA TIENDITA LLC | $ 3,834.00 |
| TOTAL | | $ 18,618.00 |

## **ALEJANDRO VENTURA-SANTOS**

67. For tax year 2015, a Form 1040A was filed for **ALEJANDRO VENTURA** (NOTE: The name **ALEJANDRO VENTURA** appears on all IRS filings for **ALEJANDRO VENTURA-**

SANTOS) claiming total income of $9,074. The IRS also provided two Wage and Tax Statement Forms W-2 (Forms W-2) for **ALEJANDRO VENTURA**. These Forms W-2 were from Jen-Tex Delis Inc. ($6,011) and IQOR Holdings US Inc. ($3,063).

68. For tax years 2016 and 2017, Forms 1040 were filed for **ALEJANDRO VENTURA** that included Schedules C (EZ). The Schedules C reflect that the principal business or profession of **ALEJANDRO VENTURA** is "STORE MANAGER". These Schedules C account for all the income claimed on the 2016 and 2017 Forms 1040 filed for **ALEJANDRO VENTURA** and are reflected in the below table.

69. For tax year 2018, the IRS showed no Form 1040 filed for **ALEJANDRO VENTURA**, as of April 27, 2020.

| Year | Name | Wages | Net Profit |
|------|------|-------|------------|
| 2015 | ALEJANDRO VENTURA | $ 9,074.00 | $ - |
| 2016 | ALEJANDRO VENTURA | $ - | $ 6,874.00 |
| 2017 | ALEJANDRO VENTURA | $ - | $ 10,974.00 |
| 2018 | ALEJANDRO VENTURA | $ - | $ - |
| TOTAL | | | $17,848.00 |

## FRANCISCO VENTURA-SANTOS

70. For tax years 2015, 2016, 2017, 2018, the IRS showed no Form 1040 filed for **FRANCISCO VENTURA**, as of April 27, 2020.

## **Statistical Analysis**

71. According to an Arizona Attorney General Intelligence Report: "Approximately 80% of all person to person MSB money transfers globally are below $500 each. The average MSB money transfer sent from the United States to Latin American countries is below $400. A very large majority of the tens of millions of yearly person to person money transfers below $500 each are related to family maintenance while experience has shown the remaining 20% of global person to person transfers of $500 and greater have a much higher correlation with organized illegal activity".

72. Between May 11, 2017, and October 24, 2021, **LA TIENDITA** utilized Intermex to initiate approximately 10,994 wire transfers. The below statistics are derived from these 10,994 transfers (all numbers and percentages approximate; fees not included):

   A. Approximately 3,059 of these wire transfers were intended for countries other than Mexico. The average amount of these transfers was approximately $319.

   B. Approximately 7,935 of these wire transfers were intended for Mexico. The average amount of these transfers was approximately $470.

   C. Of the 7,935 wire transfers intended for Mexico, approximately 410 listed a "PAYING AGENT STATE" of Jalisco. The average amount of these transfers was approximately $638.

   D. Of the 7,935 wire transfers intended for Mexico, approximately 959 listed a "PAYING AGENT STATE" of Nayarit. The average amount of these transfers was approximately $720.

E.  Of the 7,935 wire transfers intended for Mexico, approximately 265 listed a "PAYING AGENT STATE" of Sinaloa. The average amount of these transfers was approximately $728.

73. As detailed above (based on the 10,994 transfers) the average amount of wire transfers paid out in the known drug source states Jalisco, Nayarit, and Sinaloa, is significantly higher than the average for all wire transfers sent to Mexico.

# CONCLUSION

74. Your Affiant has investigated and is continuing to investigate the following individuals and business for various offenses related to money laundering:

   A. **ALEJANDRO SAUL VENTURA SANTOS, AKA ALEJANDRO VENTURA, AKA ALEX VENTURA, AKA ALEJANDRO SANTOS, AKA "ALEX" ("ALEJANDRO VENTURA-SANTOS");**

   B. **FRANCISCO C. VENTURA-SANTOS, AKA FRANCISCO C. VENTURA, FRANCISCO VENTURA, AKA FRANCISCO SANTOS ("FRANCISCO VENTURA-SANTOS");**

   C. **LA TIENDITA LLC ("LA TIENDITA"; 2516 West Broad St., Columbus, OH).**

75. Based on the facts set forth herein, my experience, and the experience of other law enforcement officers with whom I have conferred, I submit that there is probable cause to believe that between 2015 and 2021, the exact dates being unknown, **ALEJANDRO VENTURA-SANTOS** and **FRANCISCO VENTURA-SANTOS** conspired with others to launder narcotics proceeds from the Southern District of Ohio, to Mexico, through the business **LA TIENDITA**, all in violation of Title 18 U.S.C. §1956(h). Additionally, **ALEJANDRO VENTURA-SANTOS** accepted U.S. currency represented by undercover law enforcement officers to be the proceeds of narcotics trafficking and conducted transactions designed to conceal the source, origin, nature, and control of these proceeds, all in violation of Title 18 U.S.C. §1956(a)(3). Lastly, in 2021 and 2022, **FRANCISCO VENTURA-SANTOS** accepted U.S. currency from an undercover law enforcement officer as payment for the purchase of narcotics, in violation of Title 21 U.S.C. §846 and Title 18 U.S.C. §1956(a)(3).

76. The purpose of this affidavit is to secure an Arrest Warrant for **ALEJANDRO VENTURA-SANTOS.**

Respectfully submitted,

Kevin Doyle
Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn to before me on _____, 2023.

_____
The Honorable Elizabeth A. Preston Deavers
United States Magistrate Judge